Michel Provosty and Chas. A. Danna, both of New Orleans, for appellee.

WESTERFIELD, J.

The plaintiff, a building and homestead association, alleging that, through inadvertence, it paid the city of New Orleans taxes in the sum of $143.76 for the year 1926 upon property standing in the name of Mrs. Anna C. Damonte, which taxes had been previously paid by some one else, brings this suit against the City of New Orleans for reimbursement. The city excepted that the plaintiff's petition disclosed no cause of action, and, in compliance with the rules of the First city court, at the same time answered, denying the allegations of the petition. The exception was referred to the merits, and, after hearing of the cause, there was judgment in favor of the defendant, dismissing plaintiff's suit. Plaintiff has appealed.

The exception of no cause of action is based upon the ground that a tax or assessment voluntarily paid cannot be recovered. City of New Orleans v. Jackson Brewing Co., 162 La. 121, 110 So. 110; Fuselier v. St. Landry Parish, 107 La. 221, 31 So. 678; Lisso & Bro. v. Police Jury, 127 La. 292, 53 So. 566, 31 L. R. A. (N. S.) 1141; Simpson v. City of New Orleans, 133 La. 384, 63 So. 57. Counsel for plaintiff insist that the doctrine of the cases relied upon by defendant is not applicable here, for the reason that the present suit is not "for taxes paid in error, nor for taxes excessively assessed, but for reimbursement of an amount of money paid to the City of New Orleans in error." Reliance is placed upon Civ. Code, arts. 2301, 2302, and 2303, and upon State ex rel. Newgass v. City of New Orleans, 38 La. Ann. 119, 58 Am. Rep. 168, where it was held that under articles 2301, 2302 an artificial person (the City of New Orleans, for example), as well as a natural person, is obligated to restore whatever is paid in error, whether through mistake or otherwise. This case would appear to be in point and helpful to plaintiff's contention, were it not for the fact that in City of New Orleans v. Jackson Brewing Co., 162 La. 121, 110 So. 110, 111, decided about forty years later, it was held that the right of recovery based upon Civ. Code, arts. 2301, 2302, and 2303, has no application to the city of New Orleans in the collection of taxes, because "they are regulatory only of the rights of private parties making and receiving payments in error, whereas laws regulating the collection of taxes or licenses are sui generis and constitute a system to which the general provisions of the Civil Code have little, if any, application. Lisso & Bro. v. Police Jury, 127 La. 292, 53 So. 566, 31 L. R. A. (N. S.) 1141; La. Land & Imp. Co. v. Police Jury, 156 La. 849, 101 So. 241." In declining to permit plaintiff in that case to recover under the articles of the Code referred to, the court said: " * * *. This money went into the municipal treasury, and presumably, since the contrary is not alleged or proved, has long since been expended for public purposes in the orderly administration of the business of the city. The general rule is, in the absence of a special statute authorizing such recovery, money thus paid may not be recovered. Fuselier v. St. Landry Parish, 107 La. 221, 31 So. 678; Lisso v. Police Jury, supra; Simpson v. City [of New Orleans], 133 La. 389, 63 So. 57."

In our opinion, the exception of no cause of action in this case should have been maintained and plaintiff's suit dismissed.

The view we entertain with reference to the exception makes it unnecessary to discuss the merits of the case.

Consequently, and for the reasons herein assigned, the judgment is affirmed.

Affirmed.

### SOUTHERN IRON & EQUIPMENT CO. v. BROWN & BEVILL GRAVEL CO. et al.*
### No. 3942.

Court of Appeal of Louisiana. Second Circuit, Second Division.

May 4, 1932.

*Rehearing denied June 11, 1932.

Wm. C. Boone, of Homer, for appellant.

T. H. McEachern, of Homer, for appellee.

## CULPEPPER, J.

Plaintiff sold defendant company a secondhand locomotive, for $1,000 to be paid in cash, and in addition thereto took in exchange a certain other secondhand locomotive belonging to defendant, which it gave plaintiff in exchange over and above the $1,000. The plaintiff corporation has its place of business in Atlanta, Ga., and is engaged, among other things, in the business of buying and reconditioning secondhand steam locomotives for resale, lease, or exchange. The defendant Brown & Bevill Gravel Company was at the time a partnership located at Haynesville, Claiborne parish, state of Louisiana, and engaged in the business of hauling gravel by rail transportation for building highways. J. R. Bevill, one of the members of the partnership, went to Atlanta the early part of July, 1921, for the purpose of buying for his company from plaintiff a locomotive for use in their gravel hauling business, taking with him a Mr. Hammett, an experienced engineer, to inspect, examine, and pass upon such locomotive as he might desire to buy. After looking over a number of secondhand locomotives which plaintiff had on hand, Bevill and Hammett found one of suitable size, but which needed certain changes in order to conform to the particular use for which defendant company desired it, as well as needed certain repairs. Plaintiff company,

through Mr. Pratt, its representative, agreed, according to the testimony of both Bevill and Hammett, to make the suggested alterations and repairs, and otherwise to put the locomotive in good running condition. An agreement between Bevill and Pratt was then tentatively reached, whereby plaintiff sold defendant company the locomotive, which bore engine No. 1520, f. o. b. at Atlanta. The consideration agreed upon was $1,000, payable cash, and, in addition, defendant was to give and deliver to plaintiff at Atlanta a locomotive, being engine No. 1625, belonging to defendant company, and which it had been theretofore using in its business.

Bevill and Hammett then returned to Haynesville. On July 15, 1921, Mr. Pratt called at defendant's place of business in Haynesville, apparently to close out the deal. After a discussion with J. R. Bevill and his partner, R. S. Brown, whom it appears J. R. Bevill desired to consult, and for which reason the deal was not finally closed while J. R. Bevill was in Atlanta, a formal contract was outlined, written, and signed as follows:

"Southern Iron & Equipment Co.

"Atlanta, Georgia.

"Gentlemen:—Referring to the 20-inch consolidated type locomotive recently purchased from you lettered 'Brown & Bevill Gravel No. 2,' your number 1625.

"Also referring to inspection made of your 10 wheel type locomotive by Mr. Bevill and Mr. Hammett, your shop No. 1520, and also confirming conversation today with your Mr. Pratt, we will make the following trade with you:

"We accept from you your locomotive No. 1520 F. O. B. tracks your shop at Atlanta, you to do the following work to the 1520 before shipment:

"Change smoke stacks and grates to burn coal, take slack out of throttle, see that headlight is in good working order, supply 4½ inch ciphon with 25 feet of hose, repair roof of cab, see that spring hanger is in good condition. In the event that you cannot equip engine with 4½ inch ciphon, wire us if you can supply this. Engine is to be lettered 'Brown & Bevill Gravel Co., No. 3' in the usual manner.

"For your Engine No. 1520 with the work specified above, completed F. O. B. Atlanta, we will trade you our Consolidated Type Engine referred to above and $1000.00 cash advance to you, we delivering this consolidation back to your shops at Atlanta.

"You will please secure for us a competent messenger to take charge of these locomotives at the usual rate of $8.00 per day of 24 hours plus Railroad fare both ways; in other words, we accept your engine F. O. B. tracks

your shops, and deliver our engine F. O. B. your shops. You can draw on the Brown & Bevill Gravel Co. through the Citizens Bank of Haynesville, Louisiana for the $1000.00 cash difference and the draft will be paid on presentation. It is understood that we are to have the use of our Consolidated Engine until the arrival of the one above designated.

"Yours very truly,
"Brown & Bevill Gravel Co.,
"By J. R. Bevill.
"Accepted Southern Iron & Equipment Co.
"By H. M. Pratt.
"Furnish I. C. C. Copers Test #1520 cold and under steam before shipment."

Upon arrival of the locomotive, engine 1520, at Haynesville, defendant company, it seems, shipped its locomotive, engine No. 1625, to plaintiff in Atlanta, and proceeded to put in use the locomotive it had received. It was found to be nonusable. Many things, so the testimony shows, were found to be the matter with it, some of which plaintiff had specifically agreed in the written contract to remedy but had failed to do, and other things not mentioned specifically therein which defendant claims were promised in the verbal understanding between J. R. Bevill and H. M. Pratt at Atlanta to be done but were not done. In order to put the locomotive in serviceable condition, defendant was compelled to and did take it to the railroad shops of the L. & N. W. Railway Company at Homer, La., where it was put in condition at a total cost of $426.49. It seems that defendant charged this amount against the $1,000 and certain freight bills and other expenses chargeable to defendant, paid plaintiff the difference amounting to $540.23, and refused to make further payment.

Plaintiff, being unable to obtain settlement for this balance, brought suit to recover $474.86. Defendant denied owing any additional amount, and alleged that plaintiff had failed to make the repairs and changes which it had obligated itself to make; and therefore the locomotive could not be used. It also alleged that it was compelled to expend this amount, $474.86, for materials and repairs, labor, etc., in order to put it in the condition agreed upon, for which amount defendant company reconvenes and claims by way of set off against plaintiff's claim. Defendant also reconvened for $400 for the loss of use of the locomotive for four days at $100 per day, while the repairs were being made, and for $200 for loss of profits from sales of gravel. There was judgment for plaintiff in the sum prayed for and also judgment in reconvention in favor of defendant in suit for a like sum as a counterclaim and set-off, and in the further and additional sum of $400 as damages. Plaintiff was decreed to pay all costs. From this judgment plaintiff has appealed.

Plaintiff contends that the extent of its obligation is set forth in the foregoing written offer and acceptance, which constituted the entire contract between the parties, and that parole evidence is and was inadmissible to vary or contradict its provisions. It also contends that it complied with the written contract in every particular, made every alteration, and performed every act which it agreed to do or perform.

Defendant contends that plaintiff failed to make the repairs which it obligated itself in the written contract, and contends that it was plaintiff's duty to put the locomotive in good running order and condition, which it failed to do, and by reason of which the repairs made upon it were necessary before it could be used.

Plaintiff's witnesses testified that the alterations and repairs called for in the written contract were actually in fact made, and that the locomotive was in good running condition when it left plaintiff's shops in Atlanta. Defendant's witnesses, on the contrary, testified equally positive that the locomotive could not be used when it reached Haynesville, La., because of its bad condition. The locomotive was not, when received, in a serviceable or running condition. It had to be taken to the shop for repairs before it could be used. The testimony further shows that all of the repairs that were made were necessary, and that the charges and expenses in that connection paid to the L. & N. W. Railway Company were correct, reasonable, and are not disputed.

The question is, then, whether the repairs actually made by defendant and paid for by it were such as were contemplated by the contract, and such as plaintiff was obliged to make under its general warranty. Upon this point the testimony is in irreconcilable conflict. In view of the fact that plaintiff's witnesses testify that the locomotive was in good running condition when it left plaintiff's shop, when as a matter of fact it was not, tends to discredit their testimony on other material particulars. The contract called for change of smokestacks and grates to burn coal. The testimony of W. J. Jones, plaintiff's engineer who attempted to operate the locomotive, testified: "You couldn't shake the grates and you would have to wait until the fire died down and then get in there and shovel that out." Hammett testified that it had one set of coal and one set of wood grates; that it had one section for coal and one for wood grate, had no shaker or anything of the kind, and "you * * * had to wait until the fire died down and get in and shovel out the cinders and coal that didn't burn up"; that "the only way they could get it out, after they had it all fired up, was to get in there and pour water on it and throw it out with a shovel." He says they made an effort to use it, but could not; that the

coal section "had just as well been another section of wood grate; in fact, it would have been better." J. F. Simpson, the master mechanic who had charge of repairing the locomotive for defendant, testified the grates he found in it were either wood or anthracite coal grates; that they could not be operated with coal alone; that he "put in several grates and shaker bars and fixed it to run."

■ Plaintiff contends that, in·as much as the contract simply calls for coal grates without specifying the kind of coal to be used, plaintiff was at liberty to put in either kind, and did put in grates for burning anthracite coal. The testimony of defendant's witnesses shows that anthracite coal is not used in locomotives of this type, but that a soft cheaper grade of coal is the kind in common use in this make of locomotives, and is the kind defendant expected to use. From the testimony on this point, we think the requirements as to the change to be made in the grates were not complied with by plaintiff, and it appears that this was one of the most serious troubles defendant found in trying to operate the locomotive. Mr. Hammett, who saw the locomotive in Atlanta and pointed out the various changes and repairs required to be made, and saw it after it was brought to Haynesville, testified that the only thing he could tell that had been done to it was to change the smokestack a little and paint defendant's name on it. He testified that plaintiff's representative at Atlanta told him and Mr. Bevill that the cylinders had been rebored and new plates and new crossheads put in, and that there was nothing wrong with the dash. These, or some of them at least, were parts which were not visible and could not be detected by a simple inspection. He also states that at the time he and Bevill inspected it at Atlanta it had no steam on. From this it is readily seen that Hammett and Bevill had no way of telling what defects might show up in way of leaky valves, joints, etc., but relied, as they had a right to do, upon the representations of plaintiff as to latent defects. W. J. Jones testified that, when he attempted to use the locomotive, the air pumps would not work and the rings were not any account. He had to pack the pump, the engine would not pull, and the lubrication was not any good. Asked if the locomotive was in working condition, he answered, "No, sir—I would say that it was a scrap pile thrown together and painted— There were no brakes—you had to use the reverse lever when going down hill." Asked if the slack had been taken up in the throttle, he said, "One hole in it was longer than your arm." This item was specifically mentioned in the contract. While it is true that some of the repairs called for in the written contract of sale were made, others equally as important were not. And, aside from that, it was plaintiff's duty to put the locomotive in such condition as to make it fit for use in the business for which defendant bought it; otherwise it could not be expected that defendant would have bought it at any price. It is clear that many of its defects were latent and could not be seen by simple inspection, such as was made by Bevill and Hammett. It was plaintiff's duty to inform these gentlemen of these hidden defects, and this duty it failed to discharge. This·should have been done regardless of what was stipulated in the contract. Plaintiff is bound under the general obligation of warranty against such defects.

■ We think, as did the trial judge, that defendant has the right to offset so much of the price to be paid as it had to incur in expenses in putting the locomotive in condition for the use for which it was intended. The amount of expenses thus incurred appears to have been fully proven and was necessary and reasonable.

As to damages for loss of use and of profits, they, too, appear to have been proven and to be reasonable.

Therefore, for these reasons, judgment is hereby affirmed.